(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL ASSOCIATION OF HOME BUILDERS ET AL. *v.* DEFENDERS OF WILDLIFE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 06–340.   Argued April 17, 2007—Decided June 25, 2007*

Under the Clean Water Act (CWA), petitioner Environmental Protection Agency (EPA) initially administers each State's National Pollution Discharge Elimination System (NPDES) permitting program, but CWA §402(b) provides that the EPA "shall approve" transfer of permitting authority to a State upon application and a showing that the State has met nine specified criteria.  Section 7(a)(2) of the Endangered Species Act of 1973 (ESA) requires federal agencies to consult with agencies designated by the Secretaries of Commerce and the Interior to "insure" that a proposed agency action is unlikely to jeopardize an endangered or threatened species.  The Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) administer the ESA.  Once a consultation process is complete, a written biological opinion is issued, which may suggest alternative actions to protect a jeopardized species or its critical habitat.  When Arizona officials sought EPA authorization to administer the State's NPDES program, the EPA initiated consultation with the FWS to determine whether the transfer would adversely affect any listed species.  The FWS regional office wanted potential impacts taken into account, but the EPA disagreed, finding that §402(b)'s mandatory nature stripped it of authority to disapprove a transfer based on any other considerations.  The dispute was referred to the agencies' national offices for resolution.  The FWS's biological opinion concluded that the requested transfer would not jeopardize listed species.  The EPA concluded that Arizona had met each of §402(b)'s

————————

*Together with No. 06–549, *Environmental Protection Agency* v. *Defenders of Wildlife et al.,* also on certiorari to the same court.

nine criteria and approved the transfer, noting that the biological
opinion had concluded the consultation "required" by ESA §7(a)(2).
Respondents sought review in the Ninth Circuit, petitioner National
Association of Home Builders intervened, and part of respondent De-
fenders of Wildlife's separate action was consolidated with the suit.
The court held that the EPA's transfer approval was arbitrary and
capricious because the EPA had relied on contradictory positions re-
garding its §7(a)(2) responsibilities during the administrative proc-
ess. Rather than remanding the case for the agency to explain its de-
cision, however, the court reviewed the EPA's substantive
construction of the statutes. It did not dispute that Arizona had met
CWA §402(b)'s nine criteria, but nevertheless concluded that ESA
§7(a)(2) required the EPA to determine whether its transfer decision
would jeopardize listed species, in effect adding a tenth criterion.
The court dismissed the argument that the EPA's approval was not
subject to §7(a)(2) because it was not a "discretionary action" under
50 CFR §402.03, §7(a)(2)'s interpretative regulation. The court thus
vacated the EPA's transfer decision.

*Held:*

   1. The Ninth Circuit's determination that the EPA's action was ar-
bitrary and capricious is not fairly supported by the record. This
Court will not vacate an agency's decision under the arbitrary and
capricious standard unless the agency "relied on factors which Con-
gress had not intended it to consider, entirely failed to consider an
important aspect of the problem, offered an explanation for its deci-
sion that runs counter to the evidence before the agency, or is so im-
plausible that it could not be ascribed to a difference in view or the
product of agency expertise." *Motor Vehicle Mfrs. Assn. of United
States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43.
Here, the Ninth Circuit concluded that the EPA's decision was inter-
nally inconsistent in its statements during the review process. Fed-
eral courts ordinarily are empowered to review only an agency's *final*
action, and the fact that a local agency representative's preliminary
determination is later overruled at a higher agency level does not
render the decisionmaking process arbitrary and capricious. The
EPA's final approval notice stating that §7(a)(2)'s required consulta-
tion process had been concluded may be inconsistent with its previ-
ously expressed position—and position in this litigation—that
§7(a)(2)'s consultation requirement is not triggered by a §402 transfer
application, but that is not the type of error requiring a remand. By
the time the statement was issued, the EPA and FWS had already
consulted, and the question whether that consultation had been *re-
quired* was not germane to the final agency decision. Thus, this
Court need not further delay the permitting authority transfer by

remanding to the agency for clarification. Respondents suggest that the EPA nullified their right to participate in the application proceedings by altering its legal position during the pendency of the transfer decision and its associated litigation, but they do not suggest that they were deprived of their right to comment during the comment period made available under the EPA's regulations. Pp. 10–14.

2. Because §7(a)(2)'s no-jeopardy duty covers only discretionary agency actions, it does not attach to actions (like the NPDES permitting transfer authorization) that an agency is *required* by statute to undertake once certain specified triggering events have occurred. Pp. 14–25.

(a) At first glance the legislative commands here are irreconcilable. Section 402(b)'s "shall approve" language is mandatory and its list exclusive; if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application. Section 7(a)(2)'s similarly imperative language would literally add a tenth criterion to §402(b). Pp. 14–15.

(b) While a later enacted statute (such as the ESA) can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), "repeals by implication are not favored" and will not be presumed unless the legislature's intention "to repeal [is] clear and manifest." *Watt* v. *Alaska*, 451 U. S. 259, 267. Statutory repeal will not be inferred "unless the later statute ' "expressly contradict[s] the original act" ' or such a construction ' "is absolutely necessary [to give the later statute's words] any meaning at all." ' " *Traynor* v. *Turnage*, 485 U. S. 535, 548. Otherwise, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 153. The Ninth Circuit's reading of §7(a)(2) would effectively repeal §402(b)'s mandate that the EPA "shall" issue a permit whenever all nine exclusive statutory prerequisites are met. Section 402(b) does not just set *minimum* requirements; it affirmatively mandates a transfer's approval, thus operating as a ceiling as well as a floor. By adding an additional criterion, the Ninth Circuit raises that floor and alters the statute's command. Read broadly, the Ninth Circuit's construction would also partially override every federal statute mandating agency action by subjecting such action to the further condition that it not jeopardize listed species. Pp. 15–17.

(c) Title 50 CFR §402.03, promulgated by the NMFS and FWS and applying §7(a)(2) "to all actions in which there is *discretionary* Federal involvement or control" (emphasis added), harmonizes the CWA and ESA by giving effect to the ESA's no-jeopardy mandate whenever an agency has discretion to do so, but not when the agency

is forbidden from considering such extrastatutory factors. The Court
owes "some degree of deference to the Secretary's reasonable inter-
pretation" of the ESA, *Babbitt* v. *Sweet Home Chapter, Communities
for Great Ore.*, 515 U. S. 687, 703. Deference is not due if Congress
has made its intent "clear" in the statutory text, *Chevron U. S. A. Inc.*
v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842, but "if
the statute is silent or ambiguous . . . the question . . . is whether the
agency's answer is based on a permissible construction of the stat-
ute," *id.*, at 843. Because the "meaning—or ambiguity—of certain
words or phrases may only become evident . . . in context," *FDA* v.
*Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132, §7(a)(2) must
be read against the statutory backdrop of the many mandatory
agency directives whose operation it would implicitly abrogate or re-
peal were it construed as broadly as the Ninth Circuit did below.
Such a reading leaves a fundamental ambiguity. An agency cannot
simultaneously obey the differing mandates of ESA §7(a)(2) and CWA
§402(b), and consequently the statutory language—read in light of
the canon against implied repeals—does not itself provide clear guid-
ance as to which command must give way. Thus, it is appropriate to
look to the implementing agency's expert interpretation, which har-
monizes the statutes by applying §7(a)(2) to guide agencies' existing
discretionary authority, but not reading it to override express statu-
tory mandates. This interpretation is reasonable in light of the stat-
ute's text and the overall statutory scheme and is therefore entitled
to *Chevron* deference. The regulation's focus on "discretionary" ac-
tions accords with the commonsense conclusion that, when an agency
is *required* to do something by statute, it simply lacks the power to
"insure" that such action will not jeopardize listed species. The basic
principle of *Department of Transportation* v. *Public Citizen*, 541 U. S.
752—that an agency cannot be considered the legal "cause" of an ac-
tion that it has no statutory discretion *not* to take, *id.*, at 770—
supports the reasonableness of the FWS's interpretation. Pp. 17–22.

(d) Respondents' contrary position is not supported by *TVA* v.
*Hill*, 437 U. S. 153, which had no occasion to answer the question
presented in these cases. Pp. 22–24.

(e) Also unavailing is the argument that EPA's decision to trans-
fer NPDES permitting authority to Arizona represented a "discre-
tionary" agency action. While the EPA may exercise some judgment
in determining whether a State has shown that it can carry out
§402(b)'s enumerated criteria, the statute clearly does not grant it
the discretion to add another entirely separate prerequisite to that
list. Nothing in §402(b) authorizes the EPA to consider the protec-
tion of listed species as an end in itself when evaluating a transfer
application. And to the extent that some of §402(b)'s criteria may re-

Syllabus

sult in environmental benefits to marine species, Arizona has satisfied each of those criteria. Respondents' argument has also been disclaimed by the FWS and the NMFS, the agencies primarily charged with administering §7(a)(2) and the drafters of the regulations implementing that section. Pp. 24–25.

420 F. 3d 946, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 06–340 and 06–549

NATIONAL ASSOCIATION OF HOME BUILDERS, ET AL., PETITIONERS

06–340          *v.*
DEFENDERS OF WILDLIFE ET AL.

ENVIRONMENTAL PROTECTION AGENCY, PETITIONER

06–549          *v.*
DEFENDERS OF WILDLIFE ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE ALITO delivered the opinion of the Court.

These cases concern the interplay between two federal environmental statutes. Section 402(b) of the Clean Water Act requires that the Environmental Protection Agency transfer certain permitting powers to state authorities upon an application and a showing that nine specified criteria have been met. Section 7(a)(2) of the Endangered Species Act of 1973 provides that a federal agency must consult with agencies designated by the Secretaries of Commerce and the Interior in order to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." The question presented is whether §7(a)(2) effectively operates as a

tenth criterion on which the transfer of permitting power under the first statute must be conditioned. We conclude that it does not. The transfer of permitting authority to state authorities—who will exercise that authority under continuing federal oversight to ensure compliance with relevant mandates of the Endangered Species Act and other federal environmental protection statutes—was proper. We therefore reverse the judgment of the United States Court of Appeals for the Ninth Circuit.

I

A

1

The Clean Water Act of 1972 (CWA), 86 Stat. 816, 33 U. S. C. §1251 *et seq.*, established a National Pollution Discharge Elimination System (NPDES) that is designed to prevent harmful discharges into the Nation's waters. The Environmental Protection Agency (EPA) initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials. See 33 U. S. C. §1342; see also §1251(b) ("It is the policy of Congress that the Stat[e] . . . implement the permit progra[m] under sectio[n] 1342 . . . of this title"). If authority is transferred, then state officials—not the federal EPA—have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight.[1]

Under §402(b) of the CWA, "the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to [the EPA] a full and complete description of the

_____

[1] The State must advise the EPA of each permit it proposes to issue, and the EPA may object to any permit. 33 U. S. C. §§1342(d)(1), (2); see also 40 CFR §123.44(c) (2006). If the State cannot address the EPA's concerns, authority over the permit reverts to the EPA. 33 U. S. C. §1342(d)(4).

program it proposes to establish and administer under
State law or under an interstate compact," as well as a
certification "that the laws of such State . . . provide ade-
quate authority to carry out the described program." 33
U. S. C. §1342(b). The same section provides that the EPA
"shall approve each submitted program" for transfer of
permitting authority to a State "unless [it] determines
that adequate authority does not exist" to ensure that nine
specified criteria are satisfied. *Ibid.* These criteria all
relate to whether the state agency that will be responsible
for permitting has the requisite authority under state law
to administer the NPDES program.[2] If the criteria are
met, the transfer must be approved.

2

The Endangered Species Act of 1973 (ESA), 87 Stat.
884, as amended, 16 U. S. C. §1531 *et seq.*, is intended to
protect and conserve endangered and threatened species
and their habitats. Section 4 of the ESA directs the Secre-
taries of Commerce and the Interior to list threatened and

---

[2]The State must demonstrate that it has the ability: (1) to issue
fixed-term permits that apply and ensure compliance with the CWA's
substantive requirements and which are revocable for cause; (2) to
inspect, monitor, and enter facilities and to require reports to the
extent required by the CWA; (3) to provide for public notice and public
hearings; (4) to ensure that the EPA receives notice of each permit
application; (5) to ensure that any other State whose waters may be
affected by the issuance of a permit may submit written recommenda-
tions and that written reasons be provided if such recommendations are
not accepted; (6) to ensure that no permit is issued if the Army Corps of
Engineers concludes that it would substantially impair the anchoring
and navigation of navigable waters; (7) to abate violations of permits or
the permit program, including through civil and criminal penalties; (8)
to ensure that any permit for a discharge from a publicly owned treat-
ment works includes conditions requiring the identification of the type
and volume of certain pollutants; and (9) to ensure that any industrial
user of any publicly owned treatment works will comply with certain of
the CWA's substantive provisions. §§1342(b)(1)–(9).

endangered species and to designate their critical habitats. §1533. The Fish and Wildlife Service (FWS) administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine Fisheries Service (NMFS) administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce. See 50 CFR §§17.11, 222.101(a), 223.102, 402.01(b) (2006).

Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora. Section 7(a)(2) provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U. S. C. §1536(a)(2).

Once the consultation process contemplated by §7(a)(2) has been completed, the Secretary is required to give the agency a written biological opinion "setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." §1536(b)(3)(A); see also 50 CFR §402.14(h). If the Secretary concludes that the agency action would place the listed species in jeopardy or adversely modify its critical habitat, "the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate [§7(a)(2)] and can be taken by the Federal agency . . . in implementing the agency action." 16 U. S. C. §1536(b)(3)(A); see also 50 CFR §402.14(h)(3). Regulations promulgated jointly by the Secretaries of Commerce and the Interior provide that, in order to qualify as a "reasonable and prudent alternative," an alternative course of action must be able to be implemented in a way "consis-

tent with the scope of the Federal agency's legal authority
and jurisdiction." §402.02.  Following the issuance of a
"jeopardy" opinion, the agency must either terminate the
action, implement the proposed alternative, or seek an
exemption from the Cabinet-level Endangered Species
Committee pursuant to 16 U. S. C. §1536(e).  The regula-
tions also provide that "Section 7 and the requirements of
this part apply to all actions in which there is discretion-
ary Federal involvement or control."  50 CFR §402.03.

## B

### 1

In February 2002, Arizona officials applied for EPA
authorization to administer that State's NPDES program.[3]
The EPA initiated consultation with the FWS to deter-
mine whether the transfer of permitting authority would
adversely affect any listed species.

The FWS regional office concluded that the transfer of
authority would not cause any direct impact on water
quality that would adversely affect listed species.  App. to
Pet. for Cert. in No. 06–340, p. 564.  However, the FWS
office was concerned that the transfer could result in the
issuance of more discharge permits, which would lead to
more development, which in turn could have an indirect
adverse effect on the habitat of certain upland species,
such as the cactus ferruginous pygmy-owl and the Pima
pineapple cactus.  Specifically, the FWS feared that, be-
cause §7(a)(2)'s consultation requirement does not apply to
permitting decisions by state authorities,[4] the transfer of
authority would empower Arizona officials to issue indi-
vidual permits without considering and mitigating their

---

[3] At the time when Arizona applied, the EPA had already transferred
permitting authority to local authorities in 44 other States and several
United States Territories.

[4] By its terms, §7(a)(2)'s consultation requirement applies only to
"action[s] authorized, funded, or carried out" by "Federal agenc[ies]."

indirect impact on these upland species. *Id.,* at 565–566. The FWS regional office therefore urged that, in considering the proposed transfer of permitting authority, those involved in the consultation process should take these potential indirect impacts into account.

The EPA disagreed, maintaining that "its approval action, which is an administrative transfer of authority, [would not be] the cause of future non-discharge-related impacts on endangered species from projects requiring State NPDES permits." *Id.,* at 564. As a factual matter, the EPA believed that the link between the transfer of permitting authority and the potential harm that could result from increased development was too attenuated. *Id.*, at 654. And as a legal matter, the EPA concluded that the mandatory nature of CWA §402(b)—which directs that the EPA "shall approve" a transfer request if that section's nine statutory criteria are met—stripped it of authority to disapprove a transfer based on any other considerations. *Id.*, at 654–655.

Pursuant to procedures set forth in a memorandum of understanding between the agencies, the dispute was referred to the agencies' national offices for resolution. In December 2002, the FWS issued its biological opinion, which concluded that the requested transfer would not cause jeopardy to listed species. The opinion reasoned that "the loss of section 7-related conservation benefits . . . is not an indirect effect of the authorization action," *id.,* at 117, because

"loss of any conservation benefit is not caused by EPA's decision to approve the State of Arizona's program. Rather, the absence of the section 7 process that exists with respect to Federal NPDES permits reflects Congress' decision to grant States the right to administer these programs under state law provided the State's program meets the requirements of

[§]402(b) of the Clean Water Act." *Id.,* at 114.

In addition, the FWS opined that the EPA's continuing oversight of Arizona's permitting program, along with other statutory protections, would adequately protect listed species and their habitats following the transfer. *Id.*, at 101–107.

The EPA concluded that Arizona had met each of the nine statutory criteria listed in §402(b) and approved the transfer of permitting authority. In the notice announcing the approval of the transfer, the EPA noted that the issuance of the FWS's biological opinion had "conclude[d] the consultation process required by ESA section 7(a)(2) and reflects the [FWS'] agreement with EPA that the approval of the State program meets the substantive requirements of the ESA." *Id.,* at 73.

2

On April 2, 2003, respondents filed a petition in the United States Court of Appeals for the Ninth Circuit seeking review of the transfer pursuant to 33 U. S. C. §1369(b)(1)(D), which allows private parties to seek direct review of the EPA's determinations regarding state permitting programs in the federal courts of appeals. The court granted petitioner National Association of Homebuilders leave to intervene as a respondent in that case. Respondent Defenders of Wildlife also filed a separate action in the United States District Court for the District of Arizona, alleging, among other things, that the biological opinion issued by the FWS in support of the proposed transfer did not comply with the ESA's standards. The District Court severed that claim and transferred it to the Court of Appeals for the Ninth Circuit, which consolidated the case with the suit challenging the EPA transfer. See 420 F. 3d 946 (2005).

A divided panel of the Ninth Circuit held that the EPA's approval of the transfer was arbitrary and capricious

because the EPA "relied during the administrative pro-
ceedings on legally contradictory positions regarding its
section 7 obligations." *Id.,* at 959. The court concluded
that the EPA "fail[ed] to understand its own authority
under section 7(a)(2) to act on behalf of listed species and
their habitat," *id.*, at 977, because "the two propositions
that underlie the EPA's action—that (1) it must, under the
[ESA], consult concerning transfers of CWA permitting
authority, but (2) it is not permitted, as a matter of law, to
take into account the impact on listed species in making
the transfer decision—cannot both be true," *id.*, at 961.
The court therefore concluded that it was required to
"remand to the agency for a plausible explanation of its
decision, based on a single, coherent interpretation of the
statute." *Id.*, at 962.

The panel majority, however, did not follow this course
of action. Rather, the panel went on to review the EPA's
substantive construction of the statutes at issue and held
that the ESA granted the EPA both the power and the
duty to determine whether its transfer decision would
jeopardize threatened or endangered species. The panel
did not dispute that Arizona had met the nine criteria set
forth in §402(b) of the CWA, but the panel nevertheless
concluded that §7(a)(2) of the ESA provided an "affirma-
tive grant of authority to attend to [the] protection of
listed species," *id.*, at 965, in effect adding a tenth crite-
rion to those specified in §402(b). The panel dismissed the
argument that the EPA's approval of the transfer applica-
tion was not subject to §7(a)(2) because it was not a "dis-
cretionary action" within the meaning of 50 CFR §402.03
(interpreting §7(a)(2) to apply only to agency actions "in
which there is discretionary Federal involvement and
control"). 420 F. 3d, at 967–969. It viewed the FWS's
regulation as merely "coterminous" with the express
statutory language encompassing all agency actions that
are "'authorized, funded, or carried out'" by the agency.

*Id.*, at 969 (quoting 16 U. S. C. §1536(a)(2)). On these grounds, the court granted the petition and vacated the EPA's transfer decision.

In dissent, Judge Thompson explained that the transfer decision was not a "discretionary action" under 50 CFR §402.03 because "[t]he Clean Water Act, by its very terms, permits the EPA to consider only the nine specified factors. If a state's proposed permitting program meets the enumerated requirements," he reasoned, "the EPA administrator 'shall approve' the program. 33 U. S. C. §1342(b). This [c]ongressional directive does not permit the EPA to impose additional conditions." 420 F. 3d, at 980.

The Ninth Circuit denied rehearing and rehearing en banc. 450 F. 3d 394 (2006). Writing for the six judges who dissented from the denial of rehearing en banc, Judge Kozinski disagreed with the panel's conclusion that the EPA's analysis was so internally inconsistent as to be arbitrary and capricious. He further noted that, if the panel was correct on this point, the proper resolution would have been to remand to the EPA for further explanation. *Id.,* at 396–398. On the statutory question, Judge Kozinski echoed Judge Thompson's conclusion that once the nine criteria set forth in §402(b) of the CWA are satisfied, a transfer is mandatory and nondiscretionary. *Id.*, at 397–399. He rejected the panel majority's broad construction of ESA §7(a)(2), concluding that "[i]f the ESA were as powerful as the majority contends, it would modify not only the EPA's obligation under the CWA, but *every* categorical mandate applicable to *every* federal agency." *Id.*, at 399, n. 4.

The Ninth Circuit's construction of §7(a)(2) is at odds with that of other Courts of Appeals. Compare 420 F. 3d 946 (case below), with *Platte River Whooping Crane Critical Habitat Maintenance Trust* v. *FERC*, 962 F. 2d 27, 33–34 (CADC 1992), and *American Forest & Paper Association* v. *EPA*, 137 F. 3d 291, 298–299 (CA5 1998). We

granted certiorari to resolve this conflict, 549 U. S. ___
(2007), and we now reverse.

II

Before addressing this question of statutory interpreta-
tion, however, we first consider whether the Court of
Appeals erred in holding that the EPA's transfer decision
was arbitrary and capricious because, in that court's
words, the agencies involved in the decision "relied . . . on
legally contradictory positions regarding [their] section 7
obligations."  App. to Pet. for Cert. in No. 06–340, at 23.

As an initial matter, we note that if the EPA's action
was arbitrary and capricious, as the Ninth Circuit held,
the proper course would have been to remand to the
agency for clarification of its reasons.  See *Gonzales* v.
*Thomas*, 547 U. S. 183 (2006) *(per curiam)*.  Indeed, the
court below expressly recognized that this finding required
it to "remand to the agency for a plausible explanation of
its decision, based on a single, coherent interpretation of
the statute."  App. to Pet. for Cert. in No. 06–340, at 28.
But the Ninth Circuit did not take this course; instead, it
jumped ahead to resolve the merits of the dispute.  In so
doing, it erroneously deprived the agency of its usual
administrative avenue for explaining and reconciling the
arguably contradictory rationales that sometimes appear
in the course of lengthy and complex administrative deci-
sions.  We need not examine this question further, how-
ever, because we conclude that the Ninth Circuit's deter-
mination that the EPA's action was arbitrary and
capricious is not fairly supported by the record.

Review under the arbitrary and capricious standard is
deferential; we will not vacate an agency's decision unless
it

> "has relied on factors which Congress had not in-
> tended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explana-

tion for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983).

"We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Ibid.* (quoting *Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974)).

The Court of Appeals concluded that the EPA's decision was "internally inconsistent" because, in its view, the agency stated—both during preliminary review of Arizona's transfer application and in the Federal Register notice memorializing its final action—"that section 7 requires consultation regarding the effect of a permitting transfer on listed species." App. to Pet. for Cert. in No. 06–340, at 23.

With regard to the various statements made by the involved agencies' regional offices during the early stages of consideration, the only "inconsistency" respondents can point to is the fact that the agencies changed their minds—something that, as long as the proper procedures were followed, they were fully entitled to do. The federal courts ordinarily are empowered to review only an agency's *final* action, see 5 U. S. C. §704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.

Respondents also point to the final Federal Register notice memorializing the EPA's approval of Arizona's transfer application. This notice stated that the FWS's issuance of its biological opinion had "conclude[d] the consultation process required by ESA section 7(a)(2)."

App. to Pet. for Cert. in No. 06–340, at 73. Respondents contend that this statement is inconsistent with the EPA's previously expressed position—and their position throughout this litigation—that §7(a)(2)'s consultation requirement is not triggered by a transfer application under §402 of the CWA.

We are not persuaded that this statement constitutes the type of error that requires a remand. By the time the Federal Register statement was issued, the EPA had already consulted with the FWS about the Arizona application, and the question whether that consultation had been *required*, as opposed to voluntarily undertaken by the agency, was simply not germane to the final agency transfer decision. The Federal Register statement, in short, was dictum, and it had no bearing on the final agency action that respondents challenge. Mindful of Congress' admonition that in reviewing agency action, "due account shall be taken of the rule of prejudicial error," 5 U. S. C. §706, we do not believe that this stray statement, which could have had no effect on the underlying agency action being challenged, requires that we further delay the transfer of permitting authority to Arizona by remanding to the agency for clarification. See also *PDK Labs., Inc.* v. *United States Drug Enforcement Admin.*, 362 F. 3d 786, 799 (CADC 2004) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule").[5]

————————

[5] We also note that the agencies involved have resolved any ambiguity in their positions going forward. Following the issuance of the panel's opinion below, the EPA—in connection with the State of Alaska's pending application for transfer of NPDES permitting authority—requested confirmation from the FWS and NMFS of the EPA's position that "the no-jeopardy and consultation duties of ESA Section 7(a)(2) do not apply to approval of a State's application to administer the NPDES program," in the apparent hope that obtaining those agencies' views "in advance of processing Alaska's application may avoid a repetition of" the confusion that occurred during the Arizona

We further disagree with respondents' suggestion that, by allegedly altering its legal position while the Arizona transfer decision and its associated litigation was pending, the "EPA is effectively nullifying respondents' rights to participate in administrative proceedings concerning Arizona's application, and particularly respondents' rights under EPA's own regulations to comment on NPDES transfer applications." Brief for Respondents 28 (citing 40 CFR §123.61(b); emphasis deleted). Consistent with EPA regulations, the agency made available "a comment period of not less than 45 days during which interested members of the public [could] express their views on the State program." §123.61(a)(1). Respondents do not suggest that they were deprived of their right to comment during this period.[6]

Respondents also contend that if the case were remanded to the EPA, they would raise additional challenges—including, for example, a challenge to the EPA's provision of financial assistance to Arizona for the administration of its NPDES program. However, as explained below, any such agency action is separate and independent of the agency's decision to authorize the transfer of

_____

permitting process. App. to Pet. for Cert. in No. 06–549, at 96a, 95a. In response, both the FWS and the NMFS confirmed their understanding that "there is no need to conduct Section 7 consultations on proposed actions to approve State NPDES programs because such actions are not the cause of any impact on listed species and do not constitute discretionary federal agency actions to which Section 7 applies." *Id.*, at 107a; see also *id.*, at 116a (NMFS "concur[s] with EPA's conclusion that EPA is not required to engage in section 7 consultation on applications to approve State programs in situations under Section 402(b) of the CWA").

[6] Nor is there any independent right to public comment with regard to consultations conducted under §7(a)(2)—a consultation process that we conclude, in any case, was not required here. See 51 Fed. Reg. 19928 (1986) ("Nothing in section 7 authorizes or requires the Service to provide for public involvement (other than that of the applicant) in the 'interagency' consultation process").

permitting authority pursuant to §402(b). See n. 11, *infra.*
We express no opinion as to the viability of a separate
administrative or legal challenge to such actions.

### III

### A

We turn now to the substantive statutory question
raised by the petitions, a question that requires us to
mediate a clash of seemingly categorical—and, at first
glance, irreconcilable—legislative commands. Section
402(b) of the CWA provides, without qualification, that the
EPA "shall approve" a transfer application unless it de-
termines that the State lacks adequate authority to per-
form the nine functions specified in the section. 33
U. S. C. §1342(b). By its terms, the statutory language is
mandatory and the list exclusive; if the nine specified
criteria are satisfied, the EPA does not have the discretion
to deny a transfer application. Cf. *Lopez* v. *Davis*, 531
U. S. 230, 241 (2001) (noting Congress' "use of a manda-
tory 'shall' . . . to impose discretionless obligations"); *Lexe-
con Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523
U. S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally
creates an obligation impervious to judicial discretion");
*Association of Civil Technicians* v. *FLRA*, 22 F. 3d 1150,
1153 (CADC 1994) ("The word 'shall' generally indicates a
command that admits of no discretion on the part of the
person instructed to carry out the directive"); Black's Law
Dictionary 1375 (6th ed. 1990) ("As used in statutes . . .
this word is generally imperative or mandatory"). Neither
respondents nor the Ninth Circuit has ever disputed that
Arizona satisfied each of these nine criteria. See 420
F. 3d, at 963, n. 11; Brief for Respondents 19, n. 8.

The language of §7(a)(2) of the ESA is similarly impera-
tive: it provides that "[e]ach Federal agency shall, in con-
sultation with and with the assistance of the Secretary,
insure that any action authorized, funded, or carried out

by such agency . . . is not likely to jeopardize" endangered or threatened species or their habitats. 16 U. S. C. §1536(a)(2). This mandate is to be carried out through consultation and may require the agency to adopt an alternative course of action. As the author of the panel opinion below recognized, applying this language literally would "*ad[d]* one [additional] requirement to the list of considerations under the Clean Water Act permitting transfer provision." 450 F. 3d, at 404, n. 2 (Berzon, J., concurring in denial of rehearing en banc) (emphasis in original). That is, it would effectively repeal the mandatory and exclusive list of criteria set forth in §402(b), and replace it with a new, expanded list that includes §7(a)(2)'s no-jeopardy requirement.

## B

While a later enacted statute (such as the ESA) can sometimes operate to amend or even repeal an earlier statutory provision (such as the CWA), "repeals by implication are not favored" and will not be presumed unless the "intention of the legislature to repeal [is] clear and manifest." *Watt* v. *Alaska*, 451 U. S. 259, 267 (1981) (internal quotation marks omitted). We will not infer a statutory repeal "unless the later statute '"expressly contradict[s] the original act"' or unless such a construction '"is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all."'" *Traynor* v. *Turnage*, 485 U. S. 535, 548 (1988) (quoting *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 153 (1976), in turn quoting T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874)); see also *Branch* v. *Smith*, 538 U. S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute'"); *Posadas* v.

*National City Bank*, 296 U. S. 497, 503 (1936) ("[T]he intention of the legislature to repeal must be clear and manifest").  Outside these limited circumstances, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower*, *supra*, at 153.

Here, reading §7(a)(2) as the Court of Appeals did would effectively repeal §402(b)'s statutory mandate by engrafting a tenth criterion onto the CWA.[7]  Section 402(b) of the CWA commands that the EPA "shall" issue a permit whenever all nine exclusive statutory prerequisites are met.  Thus, §402(b) does not just set forth *minimum* requirements for the transfer of permitting authority; it affirmatively mandates that the transfer "shall" be approved if the specified criteria are met.  The provision operates as a ceiling as well as a floor.  By adding an additional criterion, the Ninth Circuit's construction of §7(a)(2) raises that floor and alters §402(b)'s statutory command.[8]

---

[7]JUSTICE STEVENS' dissenting opinion attempts to paper over this conflict by suggesting that the EPA and the agencies designated by the Secretary of the Interior could reconcile the commands of the CWA and the ESA by "generat[ing] an alternative course of action whereby the transfer could still take place . . . but in such a way that would honor the mandatory requirements of §7(a)(2)." *Post*, at 15.  For example, it suggests that the EPA could condition transfers of permitting authority on the State's acceptance of additional continuing oversight by the EPA (presumably beyond that oversight already contemplated by the CWA's statutory language). *Post*, at 17–19.  But such a take-it-or-leave-it approach, no less than a straightforward rejection of a transfer application, would impose conditions on an NPDES transfer beyond those set forth in §402(b), and thus alter the CWA's statutory command.

[8]It does not matter whether this alteration is characterized as an amendment or a partial repeal.  Every amendment of a statute effects a partial repeal to the extent that the new statutory command displaces earlier, inconsistent commands, and we have repeatedly recognized that implied amendments are no more favored than implied repeals. See, *e.g.*, *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 134

The Ninth Circuit's reading of §7(a)(2) would not only abrogate §402(b)'s statutory mandate, but also result in the implicit repeal of many additional otherwise categorical statutory commands. Section 7(a)(2) by its terms applies to "any action authorized, funded, or carried out by" a federal agency—covering, in effect, almost anything that an agency might do. Reading the provision broadly would thus partially override every federal statute mandating agency action by subjecting such action to the further condition that it pose no jeopardy to endangered species. See, *e.g.*, *Platte River Whooping Crane Critical Habitat Maintenance Trust* v. *FERC*, 962 F. 2d, at 33–34 (considering whether §7(a)(2) overrides the Federal Power Act's prohibition on amending annual power licenses). While the language of §7(a)(2) does not explicitly repeal any provision of the CWA (or any other statute), reading it for all that it might be worth runs foursquare into our presumption against implied repeals.

## C

### 1

The agencies charged with implementing the ESA have attempted to resolve this tension through regulations implementing §7(a)(2). The NMFS and FWS, acting jointly on behalf of the Secretaries of Commerce and the Interior and following notice-and-comment rulemaking procedures, have promulgated a regulation stating that "Section 7 and the requirements of this part apply to all

_____

(1974) ("'A new statute will not be read as wholly or even partially amending a prior one unless there exists a 'positive repugnancy' between the provisions of the new and those of the old that cannot be reconciled'") (quoting *In re Penn Central Transportation Co.*, 384 F. Supp. 895, 943 (Sp. Ct. R. R. R. A. 1974)); *United States* v. *Welden*, 377 U. S. 95, 103, n. 12 (1964) ("Amendments by implication . . . are not favored"); *United States* v. *Madigan*, 300 U. S. 500, 506 (1937) ("[T]he modification by implication of the settled construction of an earlier and different section is not favored").

actions in which there is *discretionary* Federal involve-
ment or control."    50 CFR §402.03 (emphasis added).
Pursuant to this regulation, §7(a)(2) would not be read as
impliedly repealing nondiscretionary statutory mandates,
even when they might result in some agency action.
Rather, the ESA's requirements would come into play only
when an action results from the exercise of agency discre-
tion.    This interpretation harmonizes the statutes by
giving effect to the ESA's no-jeopardy mandate whenever
an agency has discretion to do so, but not when the agency
is forbidden from considering such extrastatutory factors.

We have recognized that "[t]he latitude the ESA gives
the Secretary in enforcing the statute, together with the
degree of regulatory expertise necessary to its enforce-
ment, establishes that we owe some degree of deference to
the Secretary's reasonable interpretation" of the statutory
scheme. *Babbitt* v. *Sweet Home Chapter, Communities for
Great Ore.*, 515 U. S. 687, 703 (1995).  But such deference
is appropriate only where "Congress has not directly ad-
dressed the precise question at issue" through the statu-
tory text.    *Chevron U. S. A. Inc.* v. *Natural Resources
Defense Council, Inc.*, 467 U. S. 837, 843 (1984).

> "If the intent of Congress is clear, that is the end of
> the matter; for the court, as well as the agency, must
> give effect to the unambiguously expressed intent of
> Congress. . . . [However,] if the statute is silent or am-
> biguous with respect to the specific issue, the question
> for the court is whether the agency's answer is based
> on a permissible construction of the statute." *Id.*, at
> 842–843 (footnotes omitted).

In making the threshold determination under *Chevron*,
"a reviewing court should not confine itself to examining a
particular statutory provision in isolation." *FDA* v. *Brown
& Williamson Tobacco Corp.*, 529 U. S. 120, 132 (2000).
Rather, "[t]he meaning—or ambiguity—of certain words or

phrases may only become evident when placed in context. . . . It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Id.,* at 132–133 (quoting *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989)).

We must therefore read §7(a)(2) of the ESA against the statutory backdrop of the many mandatory agency directives whose operation it would implicitly abrogate or repeal if it were construed as broadly as the Ninth Circuit did below. When §7(a)(2) is read this way, we are left with a fundamental ambiguity that is not resolved by the statutory text. An agency cannot simultaneously obey the differing mandates set forth in §7(a)(2) of the ESA and §402(b) of the CWA, and consequently the statutory language—read in light of the canon against implied repeals—does not itself provide clear guidance as to which command must give way.

In this situation, it is appropriate to look to the implementing agency's expert interpretation, which cabins §7(a)(2)'s application to "actions in which there is discretionary Federal involvement or control." 50 CFR §402.03. This reading harmonizes the statutes by applying §7(a)(2) to guide agencies' existing discretionary authority, but not reading it to override express statutory mandates.

2

We conclude that this interpretation is reasonable in light of the statute's text and the overall statutory scheme, and that it is therefore entitled to deference under *Chevron*. Section 7(a)(2) requires that an agency "insure" that the actions it authorizes, funds, or carries out are not likely to jeopardize listed species or their habitats. To "insure" something—as the court below recognized— means "'[t]o make certain, to secure, to guarantee (something, event, etc.).'" 420 F. 3d, at 963 (quoting 7 Oxford

English Dictionary 1059 (2d ed. 1989)). The regulation's focus on "discretionary" actions accords with the common-sense conclusion that, when an agency is *required* to do something by statute, it simply lacks the power to "insure" that such action will not jeopardize endangered species.

This reasoning is supported by our decision in *Department of Transportation* v. *Public Citizen*, 541 U. S. 752 (2004). That case concerned safety regulations that were promulgated by the Federal Motor Carrier Safety Administration (FMCSA) and had the effect of triggering a Presidential directive allowing Mexican trucks to ply their trade on United States roads. The Court held that the National Environmental Policy Act (NEPA) did not require the agency to assess the environmental effects of allowing the trucks entry because "the legally relevant cause of the entry of the Mexican trucks is *not* FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority while simultaneously limiting FMCSA's discretion." *Id.*, at 769 (emphasis in original). The Court concluded that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id.*, at 770.

We do not suggest that *Public Citizen* controls the outcome here; §7(a)(2), unlike NEPA, imposes a substantive (and not just a procedural) statutory requirement, and these cases involve agency action more directly related to environmental concerns than the FMCSA's truck safety regulations. But the basic principle announced in *Public Citizen*—that an agency cannot be considered the legal "cause" of an action that it has no statutory discretion *not* to take—supports the reasonableness of the FWS's interpretation of §7(a)(2) as reaching only discretionary agency actions. See also *California* v. *United States*, 438 U. S.

645, 668, n. 21 (1978) (holding that a statutory require-
ment that federal operating agencies conform to state
water usage rules applied only to the extent that it was
not "inconsistent with other congressional directives").

3

The court below simply disregarded §402.03's interpre-
tation of the ESA's reach, dismissing "the regulation's
reference to 'discretionary . . . involvement'" as merely
"congruent with the statutory reference to actions 'author-
ized, funded, or carried out' by the agency." 420 F. 3d,
968. But this reading cannot be right. Agency discretion
presumes that an agency can exercise "judgment" in con-
nection with a particular action. See *Citizens to Preserve
Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 415–416 (1971);
see also Random House Dictionary of the English Lan-
guage 411 (unabridged ed. 1967) ("discretion" defined as
"the power or right to decide or act according to one's own
judgment; freedom of judgment or choice"). As the manda-
tory language of §402(b) itself illustrates, not every action
authorized, funded, or carried out by a federal agency is a
product of that agency's exercise of discretion.

The dissent's interpretation of §402.03 is similarly
implausible. The dissent would read the regulation as
simply clarifying that discretionary agency actions are
included within the scope of §7(a)(2), but not confining the
statute's reach to such actions. See *post*, at 7–11. But this
reading would render the regulation entirely superfluous.
Nothing in either §7(a)(2) or the other agency regulations
interpreting that section, see §402.02, suggests that dis-
cretionary actions are *excluded* from the scope of the ESA,
and there is thus no need for a separate regulation to
bring them within the statute's scope. On the dissent's
reading, §402.03's reference to "discretionary" federal
involvement is mere surplusage, and we have cautioned
against reading a text in a way that makes part of it re-

dundant.  See, *e.g.*, *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001).

This history of the regulation also supports the reading to which we defer today.  As the dissent itself points out, the proposed version of §402.03 initially stated that "Section 7 and the requirements of this Part apply to *all actions in which there is Federal involvement or control*," 48 Fed. Reg. 29999 (1983) (emphasis added); the Secretary of the Interior modified this language to provide (as adopted in the Final Rule now at issue) that the statuory requirements apply to "all actions in which there is *discretionary* Federal involvement or control," 51 Fed. Reg. 19958 (1986) (emphasis added).  The dissent's reading would  rob the word "discretionary" of any  effect, and substitute the earlier, proposed version of the regulation for the text that was actually adopted.

In short, we read §402.03 to mean what it says: that §7(a)(2)'s no-jeopardy duty covers only discretionary agency actions and does not attach to actions (like the NPDES permitting transfer authorization) that an agency is *required* by statute to undertake once certain specified triggering events have occurred.  This reading not only is reasonable, inasmuch as it gives effect to the ESA's provision, but also comports with the canon against implied repeals because it stays §7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties.

D

Respondents argue that our opinion in *TVA* v. *Hill*, 437 U. S. 153 (1978), supports their contrary position.  In that case, we held that the ESA prohibited the Tennessee Valley Authority (TVA) from putting into operation the Tellico Dam—despite the fact that the agency had already spent over $100 million on the nearly completed project— because doing so would have threatened the critical habitat of the endangered snail darter.  In language on which

respondents rely, the Court concluded that "the ordinary meaning" of §7 of the ESA contained "no exemptions" and reflected "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id.*, at 173, 185, 188.

*TVA* v. *Hill*, however, had no occasion to answer the question presented in these cases. That case was decided almost a decade before the adoption in 1986 of the regulations contained in 50 CFR §402.03. And in any event, the construction project at issue in *TVA* v. *Hill*, while expensive, was also discretionary. The TVA argued that by continuing to make lump-sum appropriations to the TVA, some of which were informally earmarked for the Tellico Dam project, Congress had implicitly repealed §7's no-jeopardy requirement as it applied to that project. See 437 U. S., at 189–193. The Court rejected this argument, concluding that "[t]he Appropriations Acts did not themselves identify the projects for which the sums had been appropriated" and that reports by congressional committees allegedly directing the TVA to complete the project lacked the force of law. *Id.*, at 189, n. 35. Central to the Court's decision was the conclusion that Congress did not *mandate* that the TVA put the dam into operation; there was no statutory command to that effect; and there was therefore no basis for contending that applying the ESA's no-jeopardy requirement would implicitly repeal another affirmative congressional directive.[9]

_____

[9] The dissent is incorrect in suggesting that "if the Secretary of the Interior had not declared the snail darter an endangered species . . . the TVA surely would have been obligated to spend the additional funds that Congress appropriated to complete the project." *Post*, at 4. To the contrary, the Court in *TVA* v. *Hill* found that there was no clear repugnancy between the ESA and the Acts appropriating funds to the TVA because the latter simply did not *require* the agency to use any of the generally appropriated funds to complete the Tellico Dam project. 437 U. S., at 189–193.

*TVA* v. *Hill* thus supports the position, expressed in §402.03, that the ESA's no-jeopardy mandate applies to every *discretionary* agency action—regardless of the expense or burden its application might impose. But that case did not speak to the question whether §7(a)(2) applies to *non*-discretionary actions, like the one at issue here. The regulation set forth in 50 CFR §402.03 addressed that question, and we defer to its reasonable interpretation.

## IV

Finally, respondents and their *amici* argue that, even if §7(a)(2) is read to apply only to "discretionary" agency actions, the decision to transfer NPDES permitting authority to Arizona represented such an exercise of discretion. They contend that the EPA's decision to authorize a transfer is not entirely mechanical; that it involves some exercise of judgment as to whether a State has met the criteria set forth in §402(b); and that these criteria incorporate references to wildlife conservation that bring consideration of §7(a)(2)'s no-jeopardy mandate properly within the agency's discretion.

The argument is unavailing. While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out §402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list. Nothing in the text of §402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application. And to the extent that some of the §402(b) criteria may result in environmental benefits to marine species,[10] there is no dispute that Ari-

---

[10] For example, §402(b) requires the EPA to consider whether the State has the legal authority to enforce applicable water quality standards—some of which, in turn, are informed by the "judgment" of the EPA's Administrator. 33 U. S. C. §1342(b)(1)(A); see also, *e.g.*, §1312.

zona has satisfied each of those statutory criteria.

Respondents' argument has been disclaimed not only by the EPA, but also by the FWS and the NMFS, the two agencies primarily charged with administering §7(a)(2) and the drafters of the regulations implementing that section. Each agency recently issued a formal letter concluding that the authorization of an NPDES permitting transfer is not the kind of discretionary agency action that is covered by §402.03. See App. to Pet. for Cert. in No. 06–549, at 103a–116a. An agency's interpretation of the meaning of its own regulations is entitled to deference "unless plainly erroneous or inconsistent with the regulation," *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997) (internal quotation marks omitted), and that deferential standard is plainly met here.[11]

––––––––––

But the permit transfer process does not itself require scrutiny of the underlying standards or of their effect on marine or wildlife—only of the state applicant's "*authority* . . . [t]o issue permits which . . . apply, and insure compliance with" the applicable standards. §1342(b)(1)(A) (emphasis added). In any event, respondents do not dispute that, as both the EPA and the FWS determined, the transfer of permitting authority to Arizona officials would have no adverse water quality related impact on any listed species. See App. to Pet. for Cert. in No. 06–340, at 562–563, 615–617.

[11] Respondents also contend that the EPA has taken, or will take, other discretionary actions apart from the transfer authorization that implicate the ESA. For example, they argue that the EPA's alleged provision of funding to Arizona for the administration of its clean water programs is the kind of discretionary agency action that is subject to §7(a)(2). However, assuming this is true, any such funding decision is a separate agency action that is outside the scope of this lawsuit. Respondents also point to the fact that, following the transfer of permitting authority, the EPA will retain oversight authority over the state permitting process, including the power to object to proposed permits. But the fact that the EPA may exercise discretionary oversight authority—which may trigger §7(a)(2)'s consultation and no-jeopardy obligations—*after* the transfer does not mean that the decision authorizing the transfer is itself discretionary.

\*    \*    \*

Applying *Chevron*, we defer to the agency's reasonable interpretation of ESA §7(a)(2) as applying only to "actions in which there is discretionary Federal involvement or control."  50 CFR §402.03.  Since the transfer of NPDES permitting authority is not discretionary, but rather is mandated once a State has met the criteria set forth in §402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger §7(a)(2)'s consultation and no-jeopardy requirements.  Accordingly, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and these cases are remanded for further proceedings consistent with this opinion.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 06–340 and 06–549

_____

NATIONAL ASSOCIATION OF HOME BUILDERS,
ET AL., PETITIONERS
06–340                   _v._
DEFENDERS OF WILDLIFE ET AL.


ENVIRONMENTAL PROTECTION AGENCY,
PETITIONER
06–549                   _v._
DEFENDERS OF WILDLIFE ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE
GINSBURG, and JUSTICE BREYER join, dissenting.

These cases present a problem of conflicting "shalls."
On the one hand, §402(b) of the Clean Water Act (CWA)
provides that the Environmental Protection Agency (EPA)
"shall" approve a State's application to administer a Na-
tional Pollution Discharge Elimination System (NPDES)
permitting program unless it determines that nine criteria
are not satisfied. 33 U. S. C. §1342(b). On the other hand,
shortly after the passage of the CWA, Congress enacted
§7(a)(2) of the Endangered Species Act of 1973 (ESA),
which commands that federal agencies "shall" insure that
their actions do not jeopardize endangered species. 16
U. S. C. §1536(a)(2).

When faced with competing statutory mandates, it is
our duty to give full effect to both if at all possible. See,
_e.g._, _Morton_ v. _Mancari_, 417 U. S. 535, 551 (1974) ("[W]hen

two statutes are capable of co-existence, it is the duty of
the courts, absent a clearly expressed congressional inten-
tion to the contrary, to regard each as effective"). The
Court fails at this task. Its opinion unsuccessfully tries to
reconcile the CWA and ESA by relying on a federal regula-
tion, 50 CFR §402.03 (2006), which it reads as limiting the
reach of §7(a)(2) to *only* discretionary federal actions, see
*ante*, at 17–19. Not only is this reading inconsistent with
the text and history of §402.03, but it is fundamentally
inconsistent with the ESA itself.

In the celebrated "snail darter" case, *TVA* v. *Hill*, 437
U. S. 153 (1978), we held that the ESA "reveals a con-
scious decision by Congress to give endangered species
priority over the 'primary missions' of federal agencies,"
*id*., at 185. Consistent with that intent, Chief Justice
Burger's exceptionally thorough and admirable opinion
explained that §7 "admits of no exception." *Id*., at 173.
Creating precisely such an exception by exempting non-
discretionary federal actions from the ESA's coverage, the
Court whittles away at Congress' comprehensive effort to
protect endangered species from the risk of extinction and
fails to give the Act its intended effect. After first giving
*Hill* the attention it deserves, I will comment further on
the irrelevance of §402.03 to these cases and offer other
available ways to give effect to both CWA and the ESA.
Having done so, I conclude by explaining why these cases
should be remanded to the EPA for further proceedings.

I

In *Hill,* we were presented with two separate questions:
(1) whether the ESA required a court to enjoin the opera-
tion of the nearly completed Tellico Dam and Reservoir
Project because the Secretary of the Interior had deter-
mined that its operation would eradicate a small endan-
gered fish known as a snail darter; and (2) whether post-
1973 congressional appropriations for the completion of
the Tellico Dam constituted an implied repeal of the ESA,

at least insofar as it applied to the Dam. 437 U. S., at 156. More than 30 pages of our opinion explain our affirmative answer to the first question, see *id.,* at 156–188, but just over four pages sufficed to explain our negative answer to the second, see *id.*, at 189–193. While it is our ruling on the first question that is relevant to the cases before us, it is our refusal to hold that the ESA itself had been impliedly repealed that the majority strangely deems most significant. See *ante,* at 21–22.

In answering *Hill*'s first question, we did not discuss implied repeals. On the contrary, that portion of the opinion contained our definitive interpretation of the ESA, in which we concluded that "the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." 437 U. S., at 174; see also *id.*, at 177 ("'The dominant theme pervading all Congressional discussion of the proposed [ESA] was the overriding need *to devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife resources'" (quoting Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N. D. L. Rev. 315, 321 (1975) (emphasis added in *Hill*))). With respect to §7 in particular, our opinion could not have been any clearer. We plainly held that it "admits of *no exception.*" 437 U. S., at 173 (emphasis added).[1]

Our opinion in *Hill* explained at length why §7 imposed obligations on "all federal agencies" to ensure that "actions authorized, funded, or carried out by them do not jeopard-

---

[1] See also *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.*, 515 U. S. 687, 692 (1995) ("Section 7 requires federal agencies to ensure that *none of their activities*, including the granting of licenses and permits, will jeopardize the continued existence of endangered species 'or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical'" (emphasis added)).

ize the continued existence of endangered species." 437
U. S., at 173 (emphasis deleted; internal quotation marks
omitted). Not a word in the opinion stated or suggested
that §7 obligations are inapplicable to mandatory agency
actions that would threaten the eradication of an endan-
gered species. Nor did the opinion describe the Tennessee
Valley Authority's (TVA) attempted completion of the
Tellico Dam as a discretionary act. How could it? After
all, if the Secretary of the Interior had not declared the
snail darter an endangered species whose critical habitat
would be destroyed by operation of the Tellico Dam, the
TVA surely would have been obligated to spend the addi-
tional funds that Congress appropriated to complete the
project.[2] Unconcerned with whether an agency action was
mandatory or discretionary, we simply held that §7 of the
ESA

> "reveals an explicit congressional decision to require
> agencies to afford *first priority* to the declared na-
> tional policy of saving endangered species. The
> pointed omission of the type of qualifying language
> previously included in endangered species legislation
> reveals a conscious decision by Congress to give en-
> dangered species *priority over the 'primary missions'*

––––––––––

[2] The Court misreads this sentence and, in so doing, overreads our
decision in *Hill*. JUSTICE ALITO maintains that *Hill* held that the "acts
appropriating funds to the TVA . . . did not *require* the agency to use
any of the generally appropriated funds to complete the Tellico Dam
project." *Ante*, at 23–24, n. 9. But *Hill* said no such thing. That case
only held that the *subsequent* appropriation of funds for the Tellico
Dam Project could not overcome the mandatory requirements of §7 of
the ESA; it did not hold that the TVA would not have been required to
spend any and all appropriated funds if the ESA had never been
passed. See *Hill*, 437 U. S., at 189–190. If the ESA had never been
enacted and did not stand in the way of the completion of the Tellico
Dam, there is no doubt that the TVA would have finished the project
that Congress had funded.

*of federal agencies.* " *Id.*, at 185 (emphasis added).[3]

The fact that we also concluded that the post-1973 congressional appropriations did not impliedly repeal the ESA provides no support for the majority's contention that the obligations imposed by §7(a)(2) may be limited to discretionary acts. A few passages from the relevant parts of *Hill* belie that suggestion. After noting the oddity of holding that the interest in protecting the survival of a relatively small number of 3-inch fish "would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million," we found "that the explicit provisions of the Endangered Species Act require precisely that result." *Id.,* at 172, 173. We then continued:

> "One would be hard pressed to find a statutory provision whose terms were any plainer than those in §7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to *insure* that actions *authorized, funded,* or *carried out* by them do not *jeopardize* the continued existence' of an endangered species or *'result* in the destruction or modification of habitat of such species . . . .' " *Id.*, at 173 (quoting 16 U. S. C. §1536 (1976 ed.) (emphasis added in *Hill*)).

We also reviewed the ESA's history to identify a variety of

------

[3] The road not taken in *Hill* also helps to clarify our interpretation that §7 was not limited to discretionary agency action. Throughout the course of the litigation, the TVA insisted that §7 did not refer to "all the actions that an agency can ever take." Brief. for Petitioner in *Tennessee Valley Authority* v. *Hill,* O.T. 1977, No. 76–1701, p. 26. Instead, the TVA sought to restrict §7 to only those actions for "which the agency has reasonable decision-making alternatives before it." *Ibid.* We rejected that narrow interpretation, stating that the only way to sustain the TVA's position would be to "ignore the ordinary meaning of plain language." *Hill,* 437 U. S., at 173.

exceptions that had been included in earlier legislation
and unenacted proposals but were omitted from the final
version of the 1973 statute.  We explained that earlier
endangered species legislation "qualified the obligation of
federal agencies," but the 1973 Act purposefully omitted
"all phrases which might have qualified an agency's re-
sponsibilities."  437 U. S., at 181, 182.  Moreover, after
observing that the ESA creates only a limited number of
"hardship exemptions," see 16 U. S. C. §1539—none of
which would apply to federal agencies—we applied the
maxim *expressio unius est expression alterius* to conclude
that "there are no exemptions in the Endangered Species
Act for federal agencies,"437 U. S., at 188.

Today, however, the Court countenances such an ex-
emption.  It erroneously concludes that the ESA contains
an unmentioned exception for nondiscretionary agency
action and that the statute's command to enjoin the com-
pletion of the Tellico Dam depended on the unmentioned
fact that the TVA was attempting to perform a discretion-
ary act.  But both the text of the ESA and our opinion in
*Hill* compel the contrary determination that Congress
intended the ESA to apply to "all federal agencies" and to
all "actions authorized, funded, or carried out by them."
*Id.,* at 173 (emphasis deleted).

A transfer of NPDES permitting authority under
§402(b) of the CWA is undoubtedly one of those "actions"
that is "authorized" or "carried out" by a federal agency.
See 16 U. S. C. §1536(b); 50 CFR §402.02 (defining "ac-
tion" as "all activities or programs of any kind authorized,
funded, or carried out, in whole or in part, by Federal
agencies in the United States or upon the high seas.
Examples include, but are not limited to . . . actions di-
rectly or indirectly causing modifications to the land,
water, or air").  It follows from *Hill* that §7(a)(2) applies to
such NPDES transfers—whether they are mandatory or
discretionary.

## II

Given our unequivocal holding in *Hill* that the ESA has "first priority" over all other federal action, 437 U. S., at 185, if any statute should yield, it should be the CWA. But no statute must yield unless it is truly incapable of coexistence. See, *e.g.*, *Morton*, 417 U. S., at 551. Therefore, assuming that §402(b) of the CWA contains its own mandatory command, we should first try to harmonize that provision with the mandatory requirements of §7(a)(2) of the ESA.

The Court's solution is to rely on 50 CFR §402.03, which states that "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." The Court explains that this regulation "harmonizes the statutes by giving effect to the ESA's no-jeopardy mandate whenever an agency has discretion to do so, but by lifting that mandate when the agency is forbidden from considering such extrastatutory factors." *Ante*, at 17. This is not harmony, and it certainly isn't effect. Rather than giving genuine effect to §7(a)(2), the Court permits a wholesale limitation on the reach of the ESA. Its interpretation of §402.03 conflicts with the text and history of the regulation, as well as our interpretation of §7 in the "snail darter" case.

To begin with, the plain language of §402.03 does not state that its coverage is limited to discretionary actions. Quite the opposite, the most natural reading of the text is that it confirms the broad construction of §7 endorsed by our opinion in *Hill*. Indeed, the only way to read §402.03 in accordance with the facts of the case and our holding that §7 "admits of no exception[s]," 437 U. S., at 173, is that it eliminates any possible argument that the ESA does not extend to situations in which the discretionary federal involvement is only marginal.

The Court is simply mistaken when it says that it reads §402.03 "to mean what it says: that §7(a)(2)'s no-jeopardy

duty covers *only* discretionary agency actions . . . ." *Ante,*
at 21 (emphasis added). That is not, in fact, what §402.03
"says." The word "only" is the Court's addition to the text,
not the agency's. Moreover, that text surely does not go on
to say (as the Court does) that the duty "does not attach to
actions (like the NPDES permitting transfer authoriza-
tion) that an agency is *required* by statute to undertake
once certain specified triggering events have occurred."
*Ibid.* If the drafters of the regulation had intended such a
far-reaching change in the law, surely they would have
said so by using language similar to that which the Court
uses today.

Nothing in the proceedings that led to the promulgation
of the regulation suggests any reason for limiting the pre-
existing understanding of the scope of §7's coverage. EPA
codified the current version of §402.03 in 1986 as part of a
general redrafting of ESA regulations. In the 1983 Notice
of Proposed Rulemaking, the proposed version of §402.03
stated that "§7 and the requirements of this Part apply to
all actions in which there is Federal involvement or con-
trol." 48 Fed. Reg. 29999 (1983). Without any explana-
tion, the final rule inserted the word "discretionary" before
"Federal involvement or control." 51 Fed. Reg. 19958
(1986).[4] Clearly, if the Secretary of the Interior meant to
limit the pre-existing understanding of the scope of the
coverage of §7(a)(2) by promulgating this regulation, that
intent would have been mentioned somewhere in the text
of the regulations or in contemporaneous comment about
them. See *National Cable & Telecommunications Assn.* v.

——————

[4] See also Kilbourne, The Endangered Species Act Under the Micro-
scope: A Closeup Look From A Litigator's Perspective, 21 Envtl. L. 499,
529 (1991) (noting that the agency did not explain the addition of the
word "discretionary"); Weller, Limiting the Scope of the Endangered
Species Act: Discretionary Federal Involvement or Control Under
Section 402.03, 5 Hastings W.-Nw. J. Envtl. L. & Pol'y 309, 311, 334
(Spring 1999) (same)

*Brand X Internet Services*, 545 U. S. 967, 1001 (2005) (holding that an agency is free within "the limits of reasoned interpretation to change course" only if it "adequately justifies the change"); *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 48 (1983) ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner"). Yet, the final rule said nothing about limiting the reach of §7 or our decision in *Hill*. Nor did it mention the change from the notice of proposed rulemaking. I can only assume, then, that the regulation does mean what both it and the notice of proposed rulemaking says: Section 7(a)(2) applies to discretionary federal action, but not *only* to discretionary action.

The only explanation the agency provided for §402.03 was the following:

> "This section, which explains the applicability of section 7, implicitly covers Federal activities within the territorial jurisdiction of the United States and upon the high seas as a result of the definition of 'action' in §402.02. The explanation for the scope of the term 'action' is provided in the discussion under §402.01 above." 51 Fed. Reg. 19937.

This statement directs us to two sources: the definition of "action" in §402.02 and the "explanation for the scope of the term 'action'" in §402.01. *Ibid.* Both confirm that there was no intent to draw a distinction between discretionary and nondiscretionary actions.

Section 402.02 provides in relevant part:

> "*Action* means *all* activities or programs *of any kind* authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
>
> "(a) actions intended to conserve listed species or their habitat;

"(b) the promulgation of regulations . . . " (second
and third emphases added.)

Actions in either of the described sub-categories are some-
times mandatory and sometimes discretionary. Likewise,
as the italicized portions indicate, the term "action" ex-
pressly refers to "all" agency activities or programs "of any
kind," regardless of whether they are discretionary or
mandatory. By reading the term "discretionary" as a
limitation on "action," the Court creates a contradiction in
the EPA's own regulation.[5]

As for the final rule's explanation for the scope of the
term 'action' in §402.01, that too is fully consistent with
my interpretation of §402.03. That explanation plainly
states that "*all* Federal actions including 'conservations
programs' are subject to the consultation requirements of
section 7(a)(2) if they 'may affect' listed species or their
critical habitats." 51 Fed. Reg. 19929 (emphasis added).
The regulation does not say all "discretionary" federal
actions, nor does it evince an intent to limit the scope of
§7(a)(2) in any way. Rather, it just restates that the ESA
applies to "all" federal actions, just as the notice of pro-

_____

[5] Petitioner National Association of Home Builders (NAHB) points to
the following language from the final rule as an indication that §7 only
applies to discretionary action: "'a Federal agency's responsibility
under section 7(a)(2) permeates the full range of discretionary authority
held by that agency.'" Brief for Petitoioners NAHB et al. 32 (quoting 51
Fed. Reg. 19937). However, that language is found in a different
section of the Final Rule—the section describing the definition of
"'[r]easonable and prudent alternatives'" under 50 CFR §402.02. When
put in its proper context, the cited language simply indicates that any
"reasonable and prudent alternative" may involve the "maximum
exercise federal agency authority when to do so is necessary, in the
opinion of the Service, to avoid jeopardy." 51 Fed. Reg. 19926. If that
isn't enough, the quoted text supports my reading of §402.03 even on
petitioner's reading. By indicating that an agency's §7(a)(2) responsi-
bility "permeates the full range" of its discretionary authority, EPA
confirmed that the ESA covers the all discretionary actions.

posed rulemaking did. This explanation of the scope of the word "action" is therefore a strong indication that the Court's reading of "discretionary" is contrary to its intended meaning.

An even stronger indication is the fact that at no point in the administrative proceedings in these cases did EPA even mention it.[6] As an initial matter, it is worth emphasizing that even if EPA had relied on §402.03, its interpretation of the ESA would not be entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), because it is not charged with administering that statute, *id.*, at 844 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme *it is entrusted to administer.*" (emphasis added)); *Department of Treasury* v. *FLRA*, 837 F. 2d 1163, 1167 (CADC 1988) ("[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference"). The Departments of the Interior and Commerce, not EPA, are charged with administering the ESA. See *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.,* 515 U. S., 687, 703–704 (1995). And EPA has conceded that the Department of the Interior's biological opinion "did not discuss 50 CFR. 402.03, and it did not address the question whether the consultation that produced the [biological opinion] was required by the ESA." Pet. for Cert. in No. 06–549, p. 24; see App. 77–124 (never mentioning §402.03). Left with this unfavorable administrative re-

—————

[6] EPA also did not rely on §402.03 in the Court of Appeals. See 420 F. 3d 946, 968 ("EPA makes no argument that its transfer decision was not a 'discretionary' one within the meaning of 50 CFR §402.03. . . . We may not affirm the EPA's transfer decision on grounds not relied upon by the agency. As the EPA evidently does not regard §402.03 as excluding the transfer decision, we should not so interpret the regulations." (citations omitted)).

cord, EPA can only lean on the fact that the Department of
the Interior has recently "clarified" its position regarding
§402.03 in a *different* administrative proceeding. See Pet.
for Cert. in No. 06–549, pp. 24–25; *id.*, at 26 ("The recent
F[ish and Wildlife Service] and N[ational Marine Fisheries
Service] communications regarding Alaska's pending
transfer application reflect those agencies' considered
interpretations . . . of [50 CFR] 402.03"); App. to Pet. for
Cert. in No. 06–340, pp. 103a–116a; see also *ante*, at 12
n. 5. We have long held, however, that courts may not
affirm an agency action on grounds other than those
adopted by the agency in the administrative proceedings.
See *SEC* v. *Chenery Corp.*, 318 U. S. 80, 87 (1943). The
majority ignores this hoary principle of administrative law
and substitutes a post-hoc interpretation of §7(a)(2) and
§402.03 for that of the relevant agency. For that reason
alone, these cases should be remanded to the agency. And
for the other reasons I have given, §402.03 cannot be used
to harmonize the CWA and the ESA.

## III

There are at least two ways in which the CWA and the
ESA can be given full effect without privileging one stat-
ute over the other.

## A

The text of §7(a)(2) itself provides the first possible way
of reconciling that provision with §402(b) of the CWA.
The subsection reads:

"Each Federal agency shall, *in consultation with and
with the assistance of the Secretary*, insure that any
action authorized, funded, or carried out by such
agency (hereinafter in this section referred to as an
'agency action') is not likely to jeopardize the contin-
ued existence of any endangered species or threatened
species or result in the destruction or adverse modifi-

cation of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section." 16 U. S. C. §1536(a)(2) (emphasis added).

The Court is certainly correct that the use of the word "shall" in §7(a)(2) imposes a mandatory requirement on the federal agencies. See *ante*, at 14. It is also correct that the ESA's "mandate is to be carried out through consultation and may require the agency to adopt an alternative course of action." *Ante,* at 15. The Court is too quick to conclude, however, that this consultation requirement creates an irreconcilable conflict between this provision and §402(b) of the CWA. It rushes to this flawed judgment because of a basic conceptual error—an error that is revealed as early as the first paragraph of its opinion. Rather than attempting to find a way to give effect to §7(a)(2)'s consultation requirement, the Court frames the question presented as "whether §7(a)(2) effectively operates as a tenth criterion on which the transfer of permitting power under the first statute must be conditioned. " *Ante*, at 1–2. The Court is not alone in this. The author of the Ninth Circuit opinion below also stated that the ESA "*adds* one requirement to the list of considerations under the Clean Water Act permitting transfer provision." 450 F. 3d, at 404 n. 2 (2006) (Berzon, J., concurring in denial of rehearing en banc) (emphasis in original). But while the ESA does mandate that the relevant agencies "consul[t]" with the Interior Department, that consultation process also provides a way for the agencies to give effect to both statutes.

The first step in the statutory consultation process is to identify whether any endangered species will be affected by an agency action. An agency proposing a particular

action, such as an NPDES transfer, will typically ask the
Secretary of the Interior whether any listed species may
be present in the area of the proposed action and whether
that action will "affect" those species.   See 16 U. S. C.
§1536(c).  It is entirely possible that no listed species will
be affected, and any anticipated conflict between the ESA
and another statute will have been avoided at this thresh-
old stage.  If, however, the Secretary determines that a
proposed action may affect an endangered species or its
critical habitat, the agency must formally consult with the
Secretary.  This consultation culminates in the issuance of
a "biological opinion," which "detail[s] how the agency
action affects the species or its critical habitat."
§1536(b)(3)(A); see also 50 CFR §402.14(h).  Even at this
stage, it is still possible that formal consultation will
reveal that the agency action will not jeopardize any spe-
cies.  See, *e.g.*, 63 Fed. Reg. 51199 (1998) (noting that FWS
rendered a "no jeopardy" finding with respect to the trans-
fer of permitting authority to Texas).

If the biological opinion concludes that the agency action
would put a listed species in jeopardy, however, the ESA
contains a process for resolving the competing demands of
agency action and species protection.  The ESA provides
that "the Secretary shall suggest those reasonable and
prudent alternatives which he believes would not violate
subsection (a)(2) and can be taken by the Federal agency
or applicant in implementing the agency action."    16
U. S. C. §1536(b)(3)(A); see also 50 CFR §402.14(h)(3).
The agency's regulations define "[r]easonable and prudent
alternatives" as

"alternative actions identified during formal consul-
tation that can be implemented in a manner consis-
tent with the intended purpose of the action, that can
be implemented consistent with the scope of the Fed-
eral agency's legal authority and jurisdiction, that is

economically and technologically feasible, and that the Director [of FWS] believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. " 50 CFR §402.02.

Thus, in the face of any conflict between the ESA and another federal statute, the ESA and its implementing regulations encourage federal agencies to work out a reasonable alternative that would let the proposed action move forward "consistent with [its] intended purpose" and the agency's "legal authority," while also avoiding any violation of §7(a)(2).

When applied to the NPDES transfer program, the "reasonable and prudent alternatives" process would enable EPA and the Department of the Interior to develop a substitute that would allow a transfer of permitting authority *and* would not jeopardize endangered species. Stated differently, the consultation process would generate an alternative course of action whereby the transfer could still take place—as required by §402(b) of the CWA—but in such a way that would honor the mandatory requirements of §7(a)(2) of the ESA. This should come as no surprise to EPA, as it has engaged in pre-transfer consultations at least six times in the past and has stated that it is not barred from doing so by the CWA.[7]

Finally, for the rare case in which no "reasonable and prudent alternative" can be found, Congress has provided

_____

[7] See, *e.g.*, 63 Fed. Reg. 51199 (1998) (approving Texas' application to administer the NPDES program after consultation with FWS and stating that "EPA believes that section 7 does apply" to EPA's action); 61 Fed. Reg. 65053 (1996) (approving Oklahoma's NPDES application after consultation with FWS and stating that "EPA's approval of the State permitting program under section 402 of the Clear Water Act is a federal action subject to [§7's consultation] requirement"); see also Tr. of Oral Arg. 5 (conceding that EPA conducted six pre-transfer consultations in the past).

yet another mechanism for resolving any conflicts between the ESA and a proposed agency action. In 1978, shortly after our decision in *Hill*, Congress amended the ESA to create the "Endangered Species Committee," which it authorized to grant exemptions from §7(a)(2). 16 U. S. C. §1536(e). Because it has the authority to approve the extinction of an endangered species, the Endangered Species Committee is colloquially described as the "God Squad" or "God Committee." In light of this weighty responsibility, Congress carefully laid out requirements for the God Committee's membership,[8] procedures,[9] and the factors it must consider in deciding whether to grant an exemption.[10]

––––––––––

[8] The Endangered Species Committee is composed of six high-ranking federal officials and a representative from each affected State appointed by the President. See 16 U. S. C. §1536(e)(3).

[9] See 16 U. S. C. §§1536(e)–(l).

[10] Title 16 U. S. C. §1536(h)(1) provides:

"The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person—

"(A) it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—

"(i) there are no reasonable and prudent alternatives to the agency action;

"(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

"(iii) the action is of regional or national significance; and

"(iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

"(B) it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned."

As the final arbiter in situations in which the ESA conflicts with a proposed agency action, the God Committee embodies the primacy of the ESA's mandate and serves as the final mechanism for harmonizing that Act with other federal statutes. By creating this Committee, Congress recognized that some conflicts with the ESA may not be capable of resolution without having to forever sacrifice some endangered species. At the same time, the creation of this last line of defense reflects Congress' view that the ESA should not yield to another federal action except as a final resort and except when authorized by high level officials after serious consideration. In short, when all else has failed and two federal statutes are incapable of resolution, Congress left the choice to the Committee—not to this Court; it did not limit the ESA in the way the majority does today.

### B

EPA's regulations offer a second way to harmonize the CWA with the ESA. After EPA has transferred NPDES permitting authority to a State, the agency continues to oversee the State's permitting program. See *Arkansas* v. *Oklahoma*, 503 U. S. 91, 105 (1992) ("Congress preserved for the Administrator broad authority to oversee state permit programs"). If a state permit is "outside the guidelines and the requirements" of the CWA, EPA may object to it and block its issuance. See 33 U. S. C. §1342(d)(2); 66 Fed. Reg. 11206 (2001). Given these ongoing responsibilities, EPA has enacted a regulation that requires a State to enter into a Memorandum of Agreement (MOA) that sets forth the particulars of the agency's oversight duties. See 40 CFR §123.24(a) (2006).

The regulation governing MOAs contains several detailed requirements. For instance, the regulation states that an MOA must contain "[p]rovisions specifying classes and categories of permit applications, draft permits and

proposed permits that the State will send to the [EPA]
Regional Administrator for review, comment and, where
applicable, objection," §123.24(b)(2); "[p]rovisions specify-
ing the frequency and content of reports, documents and
other information which the State is required to submit to
the EPA," §123.24(b)(3); and "[p]rovisions for coordination
of compliance monitoring activities by the State and by
EPA," §123.24(b)(4)(i). More generally, the regulation
provides that an MOA "may include other terms, condi-
tions, or agreements" that are "relevant to the administra-
tion and enforcement of the State's regulatory program."
§123.24(a). Under the MOA regulation, furthermore, EPA
will not approve any MOA that restricts its statutory
oversight responsibility. *Ibid.*

Like the §7(a)(2) consultation process described above,
MOAs provide a potential mechanism for giving effect to
§7 of the ESA while also allowing the transfer of permit-
ting authority to a State. It is important to remember
that EPA must approve an MOA *prior to* the transfer of
NPDES authority. As such, EPA can use—and in fact has
used—the MOA process to structure its later oversight in
a way that will allow it to protect endangered species in
accordance with §7(a)(2) of the ESA. EPA might negotiate
a provision in the MOA that would require a State to
abide by the ESA requirements when issuing pollution
permits. See Brief for American Fisheries Society et al. as
*Amici Curiae* 28. ("In the Maine MOA, for example, EPA
and the state agreed that state permits would protect
ESA-listed species by ensuring compliance with state
water quality standards"). Alternatively, "EPA could
require the state to provide copies of draft permits for
discharges in particularly sensitive habitats such as those
of ESA-listed species or for discharges that contain a
pollutant that threatens ESA-listed wildlife." *Id.*, at 10.
Or the MOA might be drafted in a way that would allow
the agency to object to state permits that would jeopardize

any and all endangered species. See *id.*, at 28 (explaining that the Maine MOA includes a provision allowing EPA to "object to any state permit that risks harm to a listed species by threatening water quality"). These are just three of many possibilities. I need not identify other ways EPA could use the MOA process to comply with the ESA; it is enough to observe that MOAs provide a straightforward way to give the ESA its full effect without restricting §7(a)(2) in the way the Court does.

## IV

As discussed above, I believe that the Court incorrectly restricts the reach of §7(a)(2) to discretionary federal actions. See Part II, *supra.* Even if such a limitation were permissible, however, it is clear that EPA's authority to transfer permitting authority under §402(b) *is* discretionary.[11]

The EPA Administrator's authority to approve state permit programs pursuant to §402(b) of the CWA does not even fit within the Court's description of the category of mandatory actions that the Court holds are covered by the ESA. In the Court's words, that category includes actions "that an agency is *required* by statute to undertake once certain specified triggering events have occurred." *Ante*, at 22. The "triggering event" for EPA's approval is simply the filing of a satisfactory description of the State's proposed program. See 33 U. S. C. §1342(b). The statute then commands that the EPA Administrator "shall approve" the submitted program unless he determines that state law does not satisfy nine specified conditions. Those conditions are not "triggering events"; they are potential objections to the exercise of the Administrator's authority.

What is more, §402(b) is a perfect example of why our

--------

[11] Because it is quite lengthy, I include the full text of §402(b) in an appendix to this dissent.

analysis should not end simply because a statute uses the word "shall." Instead, we must look more closely at its listed criteria to determine whether they allow for discretion, despite the use of "shall." After all, as then-Justice Rehnquist's dissenting opinion in the "snail darter" case explains, a federal statute using the word "shall" will sometimes allow room for discretion. See *Hill*, 437 U. S. at 211–212 (Rehnquist, J., dissenting).[12]    In these cases, there is significant room for discretion in EPA's evaluation of §402(b)'s nine conditions. The first criterion, for example, requires the EPA Administrator to examine five other statutes and ensure that the State has adequate authority to comply with each. 33 U. S. C. §1342(b)(1)(A). One of those five statutes, in turn, expressly directs the Administrator to exercise his "judgment." §1312. Even the Court acknowledges that EPA must exercise "some judgment in determining whether a State has demonstrated that it has the authority to carry out §402(b)'s enumerated statutory criteria." *Ante*, at 24. However, in the very same breath, the Court states that the dispositive fact is that "the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Ibid*. This reasoning flouts the Court's own logic. Under the Court's reading of §402.03, §7(a)(2) applies to discretionary federal actions of any kind. The Court plainly acknowledges that EPA exercises discretion when deciding whether to transfer permitting authority to a State. If we are to take the

—————

[12] See *Gutierrez de Martinez* v. *Lamagno*, 515 U. S. 417, 432–433, n. 9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.' See D. Mellinkoff, Mellinkoff's Dictionary of American Legal Usage 402–403 (1992) ('shall' and 'may' are 'frequently treated as synonyms' and their meaning depends on context); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) ("Courts in virtually every English-speaking jurisdiction have held—by necessity—that shall means may in some contexts, and vice versa.')").

Court's approach seriously, once *any* discretion has been identified—as it has here—§7(a)(2) must apply.[13]

The MOA regulation described in Part III–B, *supra,* also demonstrates that an NPDES transfer is not as ministe-

—————

[13] The Court also claims that the "basic principle announced in" *Department of Transportation* v. *Public Citizen*, 541 U. S. 752 (2004),— "that an agency cannot be considered the legal 'cause' of an action that it has no statutory discretion *not* to take"—supports its reliance on §402.03. *Ante*, at 20. First of all, the Court itself recognizes that it must distance itself from that case, *ibid.*, because *Public Citizen* dealt with a procedural requirement under the National Environmental Policy Act (NEPA), not a substantive requirement like that imposed by §7(a)(2) of the ESA, see *TVA* v. *Hill*, 437 U. S. 158, 188, n. 34 (1978) (holding that NEPA cases are "completely inapposite" to the ESA context). What the Court does not recognize, however, is that what it views as the "basic principle" of *Public Citizen* is stated too broadly and therefore inapplicable to this case. *Ante,* at 20.

Our decision in *Public Citizen* turned on what we called "a critical feature of the case": that the Federal Motor Carrier Safety Administration (FMCSA) had "no ability to countermand" the President's lifting a moratorium that prohibited certain motor carriers from obtaining authority to operate within the United States. 541 U. S., at 766. Once the President decided to lift that moratorium, and once the relevant vehicles had entered the United States, FMCSA was required by statute to register the vehicles if certain conditions were met. *Ibid.* ("Under FMCSA's entirely reasonable reading of this provision, it must certify any motor carrier that can show that it is willing and able to comply with the various substantive requirements for safety and financial responsibility contained in DOT regulations; only the moratorium prevented it from doing so for Mexican motor carriers before 2001" (emphasis deleted)). Therefore, any potential NEPA concerns were generated by another decisionmaker, the President, and not the FMCSA. Here, by contrast, EPA is not required to act ministerially once another person or agency has made a decision. Instead, EPA must exercise *its own* judgment when considering the transfer of NPDES authority to a State; it also has *its own* authority to deny such a transfer. Any effect on endangered species will be caused, even if indirectly, by the agency's own decision to transfer NPDES authority. Cf. 50 CFR §402.02 (providing that the ESA will apply to all agency activities that "directly *or indirectly* caus[e] modifications to the land, water, or air" (emphasis added)).

rial a task as the Court would suggest. The agency retains significant discretion under §123.24 over the content of an MOA, which of course must be approved prior to a transfer. For instance, EPA may require a State to file reports on a weekly basis or a monthly basis. It may require a State to submit only certain classes and categories of permit applications. And it may include any additional terms and conditions that are relevant to the enforcement of the NPDES program. There is ample room for judgment in all of these areas, and EPA has exercised such judgment in the past when approving MOAs from many States. See, *e.g.*, Approval of Application by Maine to Administer the NPDES Program, 66 Fed. Reg. 12791, (2001); Approval of Application by Maine to Administer the NPDES Program; Texas, 63 Fed. Reg. 51165 (1998).

In fact, in an earlier case raising a question similar to this one, see *American Forest & Paper Assn.* v. *EPA*, 137 F. 3d 291, 298–299 (CA5 1998), EPA itself explained how 40 CFR §123.24 gives it discretion over the approval of a State pollution control program, see Brief for EPA in No. 96–60874 (CA5). Arguing that "[i]ndicia of discretionary involvement or control abound in [its] regulations," the agency listed its MOA regulation as a prime example.[14] Again, because EPA's approval of a State application to administer an NPDES program entails significant—indeed, abounding—discretion, I would find that §7(a)(2) of the ESA applies even under the Court's own flawed theory of these cases.

--------

[14] EPA also discussed several other regulations that give it discretion. For example, under 40 CFR §123.61(b), EPA is required to solicit public comments on a State's transfer application, and it must "approve or disapprove the program" after "taking into consideration all comments received." As EPA explained in its Fifth Circuit brief, if it "were simply acting in a ministerial fashion, such weighing of the merits of public comments would be unnecessary." Brief for EPA in No. 96–60874 (CA5).

## V

Mindful that judges must always remain faithful to the intent of the legislature, Chief Justice Burger closed his opinion in the "snail darter" case with a reminder that "[o]nce the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end." *Hill*, 437 U. S., at 194. This Court offered a definitive interpretation of the Endangered Species Act nearly 30 years ago in that very case. Today the Court turns its back on our decision in *Hill* and places a great number of endangered species in jeopardy, including the cactus ferruginous pygmy-owl and Pima pineapple cactus at issue here. At the risk of plagiarizing Chief Justice Burger's fine opinion, I think it is appropriate to end my opinion just as he did—with a quotation attributed to Sir Thomas More that has as much relevance today as it did three decades ago. This quotation illustrates not only the fundamental character of the rule of law embodied in §7 of the ESA but also the pernicious consequences of official disobedience of such a rule. Repetition of that literary allusion is especially appropriate today:

> "The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal. . . . I'm *not* God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I'm a forester. . . . What would you do? Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast—Man's laws, not God's—and if you cut them down . . . d'you really think you could stand upright in the winds that would blow then? . . . Yes, I'd give the Devil benefit of law, for my own

safety's sake." R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967) (quoted in *Hill*, 437 U. S., at 195).

Although its reasons have shifted over time, at both the administrative level and in the federal courts, EPA has insisted that the requirements of §7(a)(2) of the ESA do not apply to its decision to transfer permitting authority under §402(b) of the CWA. See App. 114; Brief for Petitioner EPA 16, 42. As I have explained above, that conclusion is contrary to the text of §7(a)(2), our decision in the *TVA* v. *Hill*, and the regulation on which the agency has since relied and upon which the Court relies on today. Accordingly, I would hold that EPA's decision was arbitrary and capricious under the Administrative Procedure Act, see 5 U. S. C. §706(2)(A), and would remand to the agency for further proceedings consistent with this opinion.

I respectfully dissent.

## APPENDIX TO OPINION OF STEVENS, J.

### 33 U. S. C. §1342(b)

"(b) State permit programs.

"At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

"(1) To issue permits which—

"(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

"(B) are for fixed terms not exceeding five years; and

"(C) can be terminated or modified for cause including, but not limited to, the following:

"(i) violation of any condition of the permit;

"(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

"(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

"(D) control the disposal of pollutants into wells;

"(2)(A) To issue permits which apply, and insure com-

pliance with, all applicable requirements of section 1318 of this title; or

"(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

"(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

"(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

"(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

"(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

"(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

"(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to

assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 06–340 and 06–549

_____

NATIONAL ASSOCIATION OF HOME BUILDERS,
ET AL., PETITIONERS
06–340                    *v.*
DEFENDERS OF WILDLIFE ET AL.


ENVIRONMENTAL PROTECTION AGENCY,
PETITIONER
06–549                    *v.*
DEFENDERS OF WILDLIFE ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2007]

JUSTICE BREYER, dissenting.

I join JUSTICE STEVENS' dissent, while reserving judgment as to whether §7(a)(2) of the Endangered Species Act of 1973, 16 U. S. C. §1536(a)(2), really covers every possible agency action even of totally unrelated agencies—such as, say, a discretionary determination by the Internal Revenue Service whether to prosecute or settle a particular tax liability, see 26 U. S. C. §7121.

At the same time I add one additional consideration in support of his (and my own) dissenting views. The Court emphasizes that "[b]y its terms, the statutory language [of §402(b) of the Clean Water Act, 33 U. S. C. §1342(b)] is mandatory and *the list exclusive*; if the nine specified criteria are satisfied, the EPA does not have the discretion to deny a transfer application." *Ante*, at 14 (emphasis added). My own understanding of agency action leads me to believe that the majority cannot possibly be correct in

concluding that the structure of §402(b) precludes applica-
tion of §7(a)(2) to the EPA's discretionary action.  See *ante*,
at 19–21 (STEVENS, J., dissenting).  That is because grants
of discretionary authority always come with *some* implicit
limits attached.  See L. Jaffe, Judicial Control of Adminis-
trative Action 359 (1965) (discretion is "a power to make a
choice" from a "permissible class of actions").  And there
are likely numerous instances in which, prior to, but not
after, the enactment of §7(a)(2), the statute might have
implicitly placed "species preservation" outside those
limits.

To take one example, consider the statute that once
granted the old Federal Power Commission (FPC) the
authority to grant a "certificate of public convenience and
necessity" to permit a natural gas company to operate a
new pipeline.  See 15 U. S. C. §717f(c)(1)(A).  It says that
"a certificate shall be issued to any qualified applicant
therefor . . . if it is found that the applicant is able and
willing properly to do the acts and to perform the service
proposed . . . and that the proposed service . . . is or will be
required by the present or future public convenience and
necessity."  §717f(e).

Before enactment of the Endangered Species Act of
1973, 87 Stat. 884, it is at least uncertain whether the
FPC could have withheld a certificate simply because  a
natural gas pipeline might threaten an endangered ani-
mal, for given the Act's language and history, species
preservation does not naturally fall within its terms.  But
we have held that the Endangered Species Act changed
the regulatory landscape, "indicat[ing] beyond doubt that
Congress intended endangered species to be afforded the
*highest* of priorities."  *TVA* v. *Hill*, 437 U. S. 153, 174
(1978) (emphasis added).  Indeed, the Endangered Species
Act demonstrated "a conscious decision by Congress to
give endangered species priority over the 'primary mis-
sions' of federal agencies."  *Id.*, at 185.  And given a new

pipeline's potential effect upon habitat and landscape, it seems reasonable to believe, once Congress enacted the new law, the FPC's successor (the Federal Energy Regulatory Commission) would act within its authority in taking species-endangering effects into account.

To take another example, the Food and Drug Administration (FDA) has, by statute, an "exclusive" list of criteria to consider in reviewing applications for approval of a new drug. See 21 U. S. C. §355(d) ("If the Secretary finds . . . [*e.g.*,] the investigations . . . do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe . . . he shall issue an order refusing to approve the application"). Preservation of endangered species is not on this "exclusive" list of criteria. Yet I imagine that the FDA *now* should take account, when it grants or denies drug approval, of the effect of manufacture and marketing of a new drug upon the preservation or destruction of an endangered species.

The only meaningful difference between the provision now before us, §402(b) of the Clean Water Act, and the energy- and drug-related statutes that I have mentioned is that the very purpose of the former is to preserve the state of our natural environment—a purpose that the Endangered Species Act shares. That shared purpose shows that §7(a)(2) must apply to the Clean Water Act *a fortiori*.